M-11-617

DSS:BGK
F.#2011R00855

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

SUBHAS GENGIAH,

           Defendant.

- - - - - - - - - - - - - - - - -X

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    -against-

THE PREMISES KNOWN AND
DESCRIBED AS 10725 117th
STREET, QUEENS, NEW YORK
AND ANY CLOSED OR LOCKED
CONTAINERS THEREIN
("SUBJECT PREMISES")

- - - - - - - - - - - - - - - - -X

SEALED AFFIDAVIT AND
COMPLAINT IN SUPPORT OF
APPLICATION FOR
ARREST WARRANT AND
SEARCH WARRANT

(21 U.S.C. § 841(a)(1))

EASTERN DISTRICT OF NEW YORK, SS:

      SEAN HARVEY, being duly sworn, deposes and states that

he is a Special Agent with the Drug Enforcement Administration

("DEA"), duly appointed according to law and acting as such.

      Upon information and belief, on or about and between

April 27, 2011 and May 19, 2011, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere,

the defendant SUBHAS GENGIAH, together with others, did knowingly

and intentionally distribute and possess with intent to

distribute a controlled substance, which offense involved a

substance containing Hydrocodone, a Schedule II controlled substance.

(Title 21, United States Code, Section 841(a)(1))

Upon information and belief, there is probable cause to believe that there is located at THE PREMISES KNOWN AND DESCRIBED AS 10725 117th STREET, QUEENS, NEW YORK 11419 AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES"), fruits, evidence, and instrumentalities of narcotics trafficking in violation of Title 21, United States Code, Section 841.

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.    I have been a Special Agent with the DEA for approximately six years.  My information in this case comes from a review of DEA records, conversations with other agents, and my direct participation in the investigation.

2.    In April 2011, law enforcement agents were advised by a cooperating source ("CS"), whose information has proven to be reliable in past investigations, that a individual known as "SUBHAS" was distributing narcotics in the Ozone Park area in Queens, New York.  According to the CS's information, SUBHAS and his associates are responsible for selling a powdery substances that is extremely similar to heroin and opium.

---

[1]    Because the purpose of this affidavit is to state only probable cause to arrest and search, I have not described all the relevant facts and circumstances of which I am aware.

3.    On April 27, 2011, the CS, at the direction and under the observation of DEA agents, placed a consensually monitored telephone call to GENGIAH.    During the conversation, GENGIAH agreed to provide a sample of the drug to the CS.    Later that day, at the direction and under the observation of DEA agents, the CS received from GENGIAH a package containing a white powdery substance.    The contents of this package was sent to the Drug Enforcement Administration Laboratory in New York and tested by a forensic chemist for the presence of controlled substances. The chemist concluded that the substance the CS received from GENGIAH consists of pharmaceutical quality Hydrocodone, a Schedule II Controlled Substance, and had a net weight of 3 grams.[2]

4.    On May 4, 2011, at the direction and under the observation of DEA agents, the CS placed a consensually monitored and recorded telephone call to GENGIAH.    During the conversation, GENGIAH agreed to sell 368 grams of this drug to the CS for $4,800.    Later that day, at the direction and observation of DEA agents, the CS received from GENGIAH a package containing a white powdery substance in a yellow bag in the vicinity of 116th Street and Liberty Avenue in Queens, NY. After the transaction, law enforcement agents observed GENGIAH

_____

[2] GENGIAH is an employee of Amneal Pharmaceuticals located in Hauppauge, New York

counting money while walking down 116th Street. A short time later, law enforcement agents surveilled GENGIAH exiting his residence, the SUBJECT PREMISES. The contents of this package were sent to the Drug Enforcement Administration Laboratory in New York and tested by a forensic chemist for the presence of controlled substances. The chemist concluded that the substance the CS received from GENGIAH consists of pharmaceutical quality Hydrocodone, a Schedule II Controlled Substance, and had a net weight of 382 grams.

5.   On May 10, 2011, the CS, at the direction and under the observation of DEA agents, placed a consensually monitored and recorded telephone call to GENGIAH. GENGIAH was using the SUBJECT TELEPHONE. During the conversation, GENGIAH agreed to sell the CS 680 grams of the white powdery substance for $9,600. Further, GENGIAH advised the CS that GENGIAH planned on receiving over 4,000 pounds (over 1,814 kilograms)of this white powdery substance from Miami and would be renting an apartment for the next three months in order to store it.

6.   On May 19, 2011, the CS, at the direction and under the observation of DEA agents, placed a consensually monitored and recorded telephone call to GENGIAH. During the conversation, GENGIAH agreed to sell the CS 680 grams of the white powdery substance for $9,600. Later that day, GENGIAH was observed by law enforcement agents leaving the SUBJECT PREMISES.

4

GENGIAH proceeded immediately to the China Express Restaurant located at 116-05 Liberty Avenue, Queens, NY.  Upon arriving at the restaurant, GENGIAH entered the restaurant and met with the CS.  At the direction of DEA agents, the CS received from GENGIAH a package containing a white powdery substance.  Thereafter, GENGIAH left the restaurant and was observed by law enforcement agents returning to the SUBJECT PREMISES.  *and utilizing the front door.* The contents of this package were sent to the Drug Enforcement Administration Laboratory in New York and tested by a forensic chemist for the presence of controlled substances.  The chemist concluded that the substance the CS received from GENGIAH consists of pharmaceutical quality Hydrocodone, a Schedule II Controlled Substance, and had a net weight of 720 grams.

Probable Cause to Search SUBJECT PREMISES

‹ 7.    THE PREMISES KNOWN AND DESCRIBED AS 10725 117th STREET, QUEENS, NEW YORK 11419 AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES"), consists of a two-story frame house with white siding and black trim.  Based on surveillance and New York City Police Department records pertaining to GENGIAH's June 7, 2011 arrest for an assault, law enforcement agents determined that GENGIAH resides at the SUBJECT PREMISES. *Residence appears to be a one-family residence.*

8.    As discussed above, there is extensive evidence that GENGIAH is engaged in the distribution of a controlled

5

substance. Immediately before GENGIAH's May 10, 2011 narcotics transaction with the CS, GENGIAH was observed by law enforcement agents leaving the SUBJECT PREMISES. Further, immediately after GENGIAH's narcotics transactions with the CS on May 4 and May 19, 2011, law enforcement agents observed GENGIAH at the SUBJECT PREMISES.

9.    Based upon my training, experience and participation in narcotics investigations, as well as my conversations with other agents, I know the following: a) individuals involved in ongoing narcotics activity frequently maintain documentary evidence for long periods of time and are not likely to destroy or move such evidence quickly; b) such documents are frequently maintained where the traffickers have ready access to them. Specifically, drug traffickers frequently maintain such documentary evidence in their residences. I have been involved in other searches of the residences of drug traffickers where documentary evidence – such as drug ledgers, receipts and notes – relating to the traffickers' ongoing criminal activity have been found; and c) narcotics traffickers commonly conceal narcotics, narcotics proceeds and related drug-dealing records in closed containers such as closets, boxes or safes in their residences and places of operation.

10.   Based on my experience as a DEA Special Agent, it is my belief that, in light of the information learned in this investigation, there is probable cause to believe that the SUBJECT PREMISES is being used as a location to receive, store and distribute Hydrocodone.  It has been my experience that such locations often contain the following: 1) quantities of Hydrocodone and other controlled substances; 2) books and records including the names, addresses and telephone numbers of narcotics purchasers and suppliers, which books and records would reveal the identities of confederates in narcotics trafficking; 3) currency used to purchase Hydrocodone or which reflects the proceeds of sales of Hydrocodone, and 4) drug paraphernalia including glassine bags, scales and cutting agents.

WHEREFORE, I respectfully request that a search warrant issue allowing DEA Special Agents and other law enforcement agents, with proper assistance from other law enforcement officers, to search the SUBJECT PREMISES, and therein to seize the items listed in Attachment A, including the following:  1) quantities of Hydrocodone and other controlled substances, 2) books and records including the names, addresses and telephone numbers of narcotics purchasers and suppliers, which books and records would reveal the identities of confederates in narcotics trafficking or constitute evidence of the commission of narcotics crimes, 3) currency used to purchase Hydrocodone or

7

which reflects the proceeds of sales of Hydrocodone, and 4) drug
paraphernalia including glassine bags, scales, and cutting
agents; all of which constitute evidence, fruits and
instrumentalities of violations of Title 21, United States Code,
Section 841.

FURTHER, I respectfully requests that an arrest warrant
be issued for SUBHAS GENGIAH so that he may be dealt with
according to law.

SEAN HARVEY
Special Agent
Drug Enforcement Administration

this
2011

### Attachment "A"

1) Quantities of Hydrocodone and other controlled substances;

2) Books and records including the names, addresses and telephone numbers of narcotics purchasers and suppliers, which books and records would reveal the identities of confederates in narcotics trafficking or constitute evidence of the commission of narcotics crimes;

3) Currency used to purchase Hydrocodone or which reflects the proceeds of sales of Hydrocodone; and

4) Drug paraphernalia including glassine bags, scales, and cutting agents.